The STATE of Ohio, Appellee,

v.

ROBERTS, Appellant.

[Cite as *State v. Roberts* (2000), 139 Ohio App.3d 757.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–980751.

Decided Aug. 4, 2000.

758

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for appellee.

*Bernard F. Wong,* for appellant.

PAINTER, Presiding Judge.

A jury found appellant Kevin Roberts guilty of one count of aggravated burglary and one count of felonious assault. The trial court imposed a three-year prison term for the aggravated burglary and a five-year prison term for the felonious assault. It ordered Roberts to serve the sentences consecutively. Roberts appeals his conviction. Though the trial was not perfect, it was fair. We affirm.

## I. Different Accounts of the Assault

Roberts and Robin Spanier had been dating for approximately three months. Roberts believed that he and Spanier had an exclusive relationship, while Spanier defined the relationship as nonexclusive "casual" dating. One evening Spanier

arranged a date with Jeffrey McGee. The two met for drinks and Spanier informed McGee that Roberts was a jealous ex-boyfriend whom she feared. Later that evening, they returned to the apartment that Spanier shared with a female roommate and their children. Spanier and McGee engaged in sex in a bedroom located in the basement.

## A. Spanier's Testimony

While still in the basement, Spanier heard banging on the door upstairs. She went upstairs and heard Roberts angrily screaming outside the door to the apartment. Spanier returned to the basement and told McGee that she would get rid of Roberts. By the time she returned upstairs, Roberts had entered the apartment and was holding a tire iron. Neither Spanier nor her roommate had invited him in, and there was evidence that the door had been pried open with an instrument similar in size to the tire iron. Spanier's roommate screamed at Roberts to leave and Spanier also told him to go.

Roberts ignored them and walked toward the stairs leading to the basement. According to Spanier, the basement light was not on, but the streetlights outside the windows provided illumination. Spanier followed Roberts to the bottom of the stairs and saw the shadow of Roberts's raised arm holding the tire iron and making a swinging motion.

Spanier ran upstairs to call the police and found that her roommate had taken the telephone outside and was already making the call. By the time Spanier re-entered the apartment, Roberts was coming up the stairs. He walked quickly past her, entered his van, and left. Spanier started walking down the basement stairs and encountered McGee attempting to come up the stairs. He was covered with blood and had a big hole in his jaw. Spanier thought McGee looked like he was going to die. While waiting for the ambulance to arrive, she wiped the blood off McGee and tried to determine the extent of his injuries.

## B. McGee's Testimony

According to McGee, he also heard banging upstairs. When Spanier went up to investigate, he heard her screaming at someone that she did not want him in the apartment and that he should not go downstairs. McGee proceeded to dress, and while sitting on the edge of a bed in the basement, he saw Roberts coming toward him, holding a tire iron up in the air, ready to strike. McGee had no weapon and, in fact, testified that he had no opportunity to defend himself. Before he could even stand up, Roberts hit him and knocked him out.

Contrary to Spanier's testimony, McGee testified that the basement light was on, but that the bedroom light was off. The next thing McGee remembered was waking in the hospital. As a result of Roberts's assault, McGee had various

injuries, including a hole in his left jaw, a cut in his arm, a cut in the back of his head that required eighteen staples, and damage to his teeth.

### C.   Roberts's Version

According to Roberts, the door to Spanier's apartment was not locked when he entered and saw Spanier coming up the basement stairs. He asked her what she was doing in the basement, to which she replied, "Nothing." He heard someone run back down the basement steps, and asked Spanier who that person was. She told him several times that there was no one downstairs. He did not believe her and walked down, unarmed, into the pitch-black basement.

Somewhere in the basement near the steps, he was stabbed in the elbow. (McGee denied stabbing anyone.) Roberts turned around and deflected the swing of an object toward his head. The object hit his finger. He shut his non-dominant hand around the object, pulled it from his attacker, and swung at what he could see—his attacker's eyeballs. Roberts swung the object twice, hitting his attacker both times. The attacker grabbed him around the waist, and Roberts hit him two or three more times. The attacker was then flung into the bedroom. Roberts dropped the object and ran. Roberts testified that he did not swing the object with the force to kill someone, but that he wanted to make sure that he was not attacked again. He described the force as sufficient to hit a single to first base, but not sufficient to hit a home run.

Roberts testified that the tire iron belonged to him and was one of several tools he had left in the basement when he helped Spanier's roommate move in. Other witnesses testified that Roberts had received an injury to his finger and one near his elbow, and that he had told them that he had been attacked.

Upon arriving at the scene, the police determined from the pry marks that the door to the apartment had been damaged recently, viewed blood in the basement, found the tire iron covered in blood, and concluded that the incident had occurred in the basement bedroom.

### II.   Assignments of Error

Roberts raises six assignments of error: (1) that the trial court committed plain error by instructing the jury on the use of deadly force in its self-defense instruction, rather than on the use of non-deadly force; (2) that the trial court erred by not declaring a mistrial when a courtroom spectator talked with witnesses in violation of the trial court's separation order; (3) that his conviction was not sustained by sufficient evidence and was against the weight of the evidence; (4) that the prosecutor committed prejudicial misconduct during closing argument; (5) that he was prejudiced by the admission of hearsay evidence of his obsession with Spanier, and that the admission of McGee's testimony regarding

the pain that he had suffered was prejudicial; and (6) that he was denied effective assistance of counsel.

## A. Self–Defense Instruction

The court instructed the jury that Roberts had the burden of proving his claim of self-defense by a preponderance of the evidence. It informed the jury that Roberts had to establish the following: (1) that he was "not at fault in creating the situation giving rise to the assault" on McGee; (2) that he "had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger was by use of deadly force"; and (3) that he had not "violated any duty to retreat to avoid the danger." The court explained that Roberts had a duty to retreat "(1) if he was at fault in creating the situation giving rise to the assault of Jeffrey McGee, or (2) if he did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and that his only means of escape from that danger was by the use of deadly force." The trial court also instructed the jury on the reasonableness of Roberts's belief of imminent danger of death or great bodily harm and on the use of excessive force.

■ Roberts argues that the trial court's instruction constituted plain error because he did not use deadly force to repel McGee's alleged attack. He argues that the jury should have been instructed on non-deadly force. Non-deadly self-defense would have required proof that he reasonably believed that some force was necessary to defend himself, and that the force used was not likely to cause death or great bodily harm. But there would have been no duty to retreat. In this respect, Roberts also argues that the trial court's instruction erroneously held him to such a duty, not only because he used non-deadly force, but also because he was assaulted in his home.

Roberts was entitled to a "complete jury instruction on all issues raised by the evidence."[1] The record demonstrates, however, that Roberts did not object at trial. As we have previously explained:

"Absent plain error, the failure to object to an error before the jury retires constitutes waiver. [Citations deleted.] The plain error rule in Crim.R. 52(B) allows defects that affect substantial rights to be noticed although they were not brought to the attention of the trial court. But an alleged error does not constitute plain error unless the outcome of the trial would clearly have been different if the error had not occurred. [Citations deleted.]"[2]

---

1. See *State v. Williford* (1990), 49 Ohio St.3d 247, 251, 551 N.E.2d 1279, 1283.

2. *State v. Kersey* (1997), 124 Ohio App.3d 513, 519, 706 N.E.2d 818, 821–822.

We conclude that the evidence supported a jury instruction on deadly self-defense. It demonstrated that Roberts swung a tire iron at McGee's face with enough strength to hit an object to "first base." Thus, if we take Roberts's analogy literally, the force he used was sufficient to knock an object—in this case McGee's head—ninety feet. He swung the tire iron at McGee's head several times. McGee suffered unconsciousness and injuries, including a head injury that required eighteen staples. Because the uncontroverted evidence indicated that Roberts used deadly force, we conclude that the trial court did not commit plain error by failing to charge the jury on non-deadly self-defense.

As to the second argument, there was sufficient evidence that Roberts resided in Spanier's apartment and thus had no duty to retreat under the facts of this case. Roberts testified that he had lived in Spanier's apartment until the day of the incident and that he also had a key. Other defense witnesses corroborated his testimony. Consequently, the trial court erred by not instructing the jury that if it found that Roberts lived in Spanier's apartment, he had no duty to retreat. We do not believe, however, that there was plain error. The jury heard evidence from which it could have rejected Roberts's self-defense claim. It obviously did not believe Roberts's version of the events at all. Thus, we cannot conclude that the outcome of the trial would clearly have been different if a no-retreat instruction had been given. Thus, we overrule Roberts's first assignment.

## B. Violation of the Separation-of-Witnesses Order

In his second assignment, Roberts claims that the trial court committed error by failing to declare a mistrial upon learning that Spanier's current boyfriend, a courtroom spectator, had spoken with witnesses in violation of the court's separation-of-witnesses order. Upon the state's request, the trial court had instructed the witnesses that they could not discuss the case with anyone other than the attorneys or their staff until the trial was over, and had ordered the witnesses to step into the hall.

At trial, Roberts's attorney requested that the boyfriend be removed because he had made comments during the proceedings and had been talking with Spanier and McGee about "what is going on and things" outside the courtroom. The trial court noted that it had not observed any inappropriate conduct from the spectator identified as Spanier's boyfriend. The prosecutor informed the court that he did not know whether the spectator was indeed Spanier's boyfriend, but that the man had been with Spanier's daughter outside the courtroom while Spanier testified. The prosecutor further stated that he had warned the spectator not to make comments in the courtroom or to laugh. The trial court advised the prosecutor that Spanier was subject to recall and that it was important that she be advised not to discuss the case with anyone but counsel and counsel's staff.

The purpose of a separation order under Evid.R. 615 is to prevent witnesses from tailoring their testimony to other witnesses' testimony.[3] "Thus, a spectator or witness may not tell a prospective witness what has taken place in the court if the judge has ordered a separation of witnesses."[4] Some of the options available if the order is violated include an instruction to the jury as to how the violation may reflect on the witnesses' credibility, the striking of the witnesses' testimony, or the declaration of a mistrial.[5] "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible."[6] Roberts's claim is that the trial court should have declared a mistrial on its own initiative.

The alleged misconduct came to light at the close of the state's case, which had included the testimony of four witnesses, two police officers, Spanier, and McGee. We glean from the record that the spectator was outside the courtroom before and during the testimony of Spanier because he was looking after her child while she testified. The only testimony that had been given before McGee and Spanier testified was that of Officer Richter, the officer who first appeared at Spanier's apartment in response to a radio broadcast. Roberts has failed to identify what testimony the spectator may have discussed with Spanier and McGee or to show that the testimony of any witness was tailored to conform to the testimony of Officer Richter or tainted by any hallway conversation. Further, a review of Spanier's and McGee's testimony does not reveal any indication of collusion or fabrication.

The only evidence in the record as to any conversations outside the courtroom came from a defense witness who stated that he had heard from "everybody" in the hallway that McGee had been sitting on the corner of the bed when Roberts attacked him. He testified, however, that Roberts told him that McGee had come out of nowhere and attacked him. Obviously, this witness's testimony was not tainted by any conversations he heard. Thus, the record before us is insufficient to support Roberts's contention that he was prevented from having a fair trial. We overrule Roberts's second assignment.

### C. Sufficiency and Weight of the Evidence

In his third assignment, Roberts challenges the sufficiency and the weight of the evidence supporting his convictions. In reviewing a sufficiency-of-the-evi-

---

3. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 434, 588 N.E.2d 819, 828.

4. *Id.*

5. See *State v. Brown* (Dec. 7, 1995), Franklin App. No. 95APA03–389, unreported, 1995 WL 723583, citing Annotation (1967), 14 A.L.R.3d 16, 1967 WL 15833.

6. *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1, 9.

dence claim, we must examine the evidence presented at trial and determine whether that evidence, viewed in a light most favorable to the state, could have convinced a rational trier of fact that Roberts was guilty beyond a reasonable doubt.[7] In determining whether the evidence was sufficient to support Roberts's convictions, we may neither resolve evidentiary conflicts nor evaluate the witnesses' credibility.[8]

In contrast, a weight-of-the-evidence challenge requires us to weigh the evidence and all reasonable inferences, to consider witness credibility, and to determine whether, in resolving the conflicts in the evidence, the jury lost its way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered.[9]

To convict Roberts of aggravated burglary under R.C. 2911.11(A)(2), the state had to prove beyond a reasonable doubt that Roberts, by force, stealth, or deception, trespassed in Spanier's occupied apartment when someone was present, with the purpose to commit a crime, and that he had a deadly weapon on his person or under his control. Roberts argues that the state failed to prove the element of trespass because the evidence showed that he had a key to and lived in Spanier's apartment and thus had a privilege to be on the premises.

Undoubtedly, "trespass is an essential element of aggravated burglary."[10] Criminal trespass occurs when one knowingly enters or remains on the premises of another without privilege to do so.[11] "Privilege" is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."[12] The state presented evidence that (1) Spanier, her roommate, and their two children were the only residents of the apartment; (2) Roberts's name was not on the lease; (3) neither Spanier nor her roommate had given Roberts a key to the apartment; (4) Roberts did not keep his possessions at the apartment; (5) neither Spanier nor her roommate invited Roberts into the apartment on the night of the attack; and (6) Roberts was told to leave that night and did not do so. Viewing the evidence most strongly in the state's favor, and without making

---

7. See *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

8. See *State v. Waddy*, 63 Ohio St.3d at 430, 588 N.E.2d at 825.

9. See *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720–721.

10. See *State v. O'Neal* (2000), 87 Ohio St.3d 402, 408, 721 N.E.2d 73, 82.

11. See R.C. 2911.21(A)(1).

12. R.C. 2901.01(12).

determinations of credibility, we conclude that the evidence was sufficient to demonstrate the essential element of trespass.

As to the weight-of-the-evidence challenge, we recognize that our role is to sit as a "thirteenth juror" and to determine whether we disagree with the "factfinder's resolution of the conflicting testimony."[13]  Spanier testified that Roberts did not live with her and that he did not have a key.  But she did admit that, during their three-month relationship, Roberts had spent nights in her apartment.  She also testified that her apartment had been broken into several months previously, but that the break-in had not involved the apartment door.  Officer Ficker testified that Spanier's door had been recently pried open.  Officer Richter testified that the door looked as if it had been forcefully pried open.

Roberts's fifteen-year-old cousin testified that Roberts lived in Spanier's apartment, that he had a key, and that she saw his clothes and tools there.  Another witness testified that Roberts "pretty much" lived with Spanier.  According to that witness, because Roberts was "constantly" in the apartment, he assumed that Roberts lived there.  Roberts's mother testified that Spanier would call her to leave messages for Roberts, that Roberts lived in Spanier's apartment, and that he had a key provided by Spanier.  Roberts himself testified that he had a key to Spanier's apartment and had spent every night but one in the apartment during their three-month relationship.  In view of all the testimony on this issue, we cannot conclude that the jury clearly lost its way in resolving the conflicts as to whether Roberts had a privilege to be in Spanier's apartment on the night he attacked McGee.

To sustain a conviction for felonious assault under R.C. 2903.11(A)(2), the state had to prove beyond a reasonable doubt that Roberts knowingly caused or attempted to cause physical harm to McGee by means of a deadly weapon.  R.C. 2923.11 defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."  An instrument must both (1) be capable of inflicting death, and (2) be designed or adapted as a weapon, or be possessed, carried or used as a weapon.  There is no doubt that a tire iron is capable of causing death;  and no doubt that Roberts used it as a weapon.

The state presented sufficient evidence to prove beyond a reasonable doubt that Roberts knowingly swung the tire iron at McGee's head, causing injuries to his jaw, arm, and head.  It clearly demonstrated that Roberts knowingly caused physical harm by an instrument used as a weapon.

---

**13.**  See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546–547.

But Roberts's argument concerning the sufficiency of the evidence relating to his felonious-assault conviction is not premised on the quantum of evidence adduced by the state. Instead, he argues that the evidence was insufficient because he proved that he acted in self-defense. This argument is flawed. "The elements of the crime and the existence of self-defense are separate issues. Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged."[14] The defendant asserting the affirmative defense of self-defense "[does] not dispute the existence of these elements, but rather [seeks] to justify [his] actions * * *."[15] Because "[a] sufficiency argument applies solely to the quantum of proof adduced by the state as to the elements of the offense,"[16] Robert's argument as to sufficiency cannot prevail.

His argument does, however, raise a legitimate weight-of-the-evidence issue. The jury heard conflicting evidence as to what occurred on the night McGee suffered his injuries. That evidence was such that the jury could have easily found that Roberts was at fault in creating the affray and that he did not believe that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of force. It could also have found that Roberts had used excessive force. We cannot say that the jury lost its way and created a manifest miscarriage of justice in rejecting Roberts's self-defense claim.

## D. Prosecutorial Misconduct

Roberts's fourth assignment concerns comments made during the prosecutor's closing argument. The prosecutor argued in rebuttal, "You know it is hard to get up and respond to ninety percent of what [defense counsel] said, because ninety percent of what he said was just pure, pure fantasy and unfounded accusations. A lot of what [defense counsel] has told you are his beliefs." At that point, defense counsel objected to the comment about his beliefs. The trial court overruled the objection and the prosecutor continued, "Ninety percent of what [defense counsel] said was purely made up story that he is trying to get you to believe fits the facts of his case." No further objection was made.

Later, the prosecutor commented about the defense witness who had testified that he had heard from others in the hallway during the trial that McGee had been sitting on the corner of the bed. Based on that testimony, the prosecutor argued, "What kind of games are going on here where the witnesses

14. *State v. Martin* (1986), 21 Ohio St.3d 91, 94, 21 OBR 386, 388, 488 N.E.2d 166, 168.

15. See *id.*

16. See *State v. Kershaw* (1999), 132 Ohio App.3d 243, 249, 724 N.E.2d 1176, 1180.

are telling other witnesses in the hallway what to say and what other people have said? What kind of coaching? What kind of planning do you think has been going on by these people to beat this case?"

On appeal, Roberts argues that the first set of comments was improper because they denigrated the role of defense counsel. At trial, Roberts's counsel objected only to the part of the argument that referred to counsel's beliefs. But Roberts now argues that the prosecutor's comments that defense counsel was making up a story were improper. Roberts also argues that the prosecutor's comment about the coaching of witnesses was improper because it argued facts not in evidence. Thus, we review this assignment under the plain-error doctrine.

To reverse a conviction on prosecutorial misconduct, we must determine not only that comments were improper, but also that they were so prejudicial that the defendant was denied a fair trial.[17] To reverse a conviction based on plain error, we must conclude that " 'but for the error, the outcome of the trial clearly would have been otherwise.' "[18]

We hold that the prosecutor's comments were improper and beyond the bounds of reasonable argument. Part of Roberts's defense was an attempt to impugn Spanier by inferring that she was an unfit mother, a drug user, and a prostitute, and that McGee was a customer. The prosecutor's statements were made in response to Roberts's counsel's closing argument in which he had used Roberts's testimony to support those inferences. While a prosecutor "may comment upon the testimony and suggest the conclusions to be drawn,"[19] the prosecutor's comments here went beyond these permissible limits. While we understand that the purpose of the comments was to insinuate the degree to which defense counsel "possibly extended conclusions to be reached from the evidence found at trial,"[20] the effect of the comments was to denigrate defense counsel by characterizing him as a liar. The "purely made up story" is akin to comments such as "smoke screen" and "searching for doubt, not truth," which have been ruled improper.[21]

---

17. See *State v. Freeman* (2000), 138 Ohio App.3d 408, 741 N.E.2d 566.

18. See *State v. Saleem* (Nov. 19, 1999), Hamilton App. No. C–960921, unreported, 1999 WL 1043725, quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

19. See *State v. Hart* (1994), 94 Ohio App.3d 665, 671, 641 N.E.2d 755, 759.

20. See *State v. Johnson* (Sept. 25, 1996), Hamilton App. No. C–950493, unreported, 1996 WL 539794.

21. See *State v. Braxton* (1995), 102 Ohio App.3d 28, 42–43, 656 N.E.2d 970, 979–980; *State v. Jones* (Aug. 28, 1998), Hamilton App. No. C–970043, unreported, 1998 WL 542713.

Further, the argument about coaching and collusion outside the courtroom was improper in that it referred to evidence outside the record. The record demonstrates that a witness testified that he had heard "everyone" outside the courtroom say that McGee had been attacked while sitting on a bed. There is no evidence suggesting that witnesses were "coached," nor does the evidence reasonably support the inference that coaching took place. In fact, what the witness heard supported the state's case, not Roberts's defense.

But, reviewing the comments in the context of the entire argument[22] and in light of the plain-error standard, we cannot say that but for the prosecutor's comments, Roberts would have been acquitted. Roberts did not deny attacking McGee. The issue before the jury was whether Roberts was justified in attacking McGee. We overrule Roberts's fourth assignment.

### E. Admission of Evidence

In his fifth assignment, Roberts claims that it was plain error for the trial court to admit McGee's hearsay testimony that Spanier had said Roberts was "very obsessive." While the statement was inadmissible hearsay elicited for the purpose of proving that Roberts was obsessive, we cannot say that the outcome of the trial would have been different if the statement had not been admitted. Spanier testified that Roberts was jealous, would check on who called her, and would pout when she told him that she was going out with friends. She also testified that she told McGee that Roberts was "young and jealous and stuff like that."

Roberts also claims that it was prejudicial error for McGee to testify that he was in excruciating pain as a result of his injuries. In order to demonstrate physical harm, the state produced photographs of the injuries inflicted on McGee by Roberts. It is obvious from the photographs that pain would have been a natural consequence of such injuries. We cannot conclude that McGee's corroboration that pain accompanied his injuries constituted plain error.

### F. Ineffective Assistance of Counsel

Last, Roberts claims that he was denied effective assistance of counsel. He points to several omissions on the part of trial counsel, including his failure to object to the state's closing argument; to question witnesses regarding violation of the separation order; to ask for a mistrial because of the violation of the separation order; to object to the admission of McGee's hearsay testimony and his testimony regarding pain and suffering; to ask for the correct self-defense

---

22. See *State v. Jones, supra,* citing *State v. Moritz* (1980), 63 Ohio St.2d 150, 17 O.O.3d 92, 407 N.E.2d 1268, and *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000.

instruction;  to move to suppress Roberts's statement to the police because he had refused to sign a waiver-of-rights form;  and to object to discovery violations. Roberts also alleges that trial counsel was ineffective for impeaching his own witnesses.

To prevail on a claim of ineffective assistance of counsel, Roberts "must demonstrate that his trial counsel substantially violated an essential duty owed to him and that this deficiency prejudiced his defense."[23]   To demonstrate prejudice, Roberts must show that "he was denied some substantive or procedural right that made the 'trial unreliable or the proceeding fundamentally unfair.' "[24] As a reviewing court, we must be "highly deferential," presume that trial counsel was competent, and not second-guess debatable trial tactics.[25]

While some of counsel's alleged deficiencies might not seem the best trial decisions in hindsight—failing to conduct a voir dire or to ask for a mistrial upon learning of the violation of the separation-of-witnesses order;  failing to object to portions of McGee's testimony;  bringing to the jury's attention defense witnesses' trouble with alcohol and driving;  asking Roberts if he meant to hurt McGee;  and failing to object to the prosecutor's improper comments during closing argument—Roberts has failed to demonstrate that the alleged deficiencies rendered his trial unfair.

Additionally, we conclude that trial counsel was not deficient in failing to seek a non-deadly self-defense instruction, because the evidence did not warrant the instruction.   Similarly, the decision not to move to suppress Roberts's statement to the police cannot be held an indication of trial counsel's incompetence, where the record contains no evidence to justify the filing of such a motion.   Even though Roberts refused to sign the waiver after being advised of his *Miranda* rights, that did not, standing alone, mean that his statement was obtained in violation of his constitutional rights.

The record fails to demonstrate any prejudice from trial counsel's failure to seek sanctions.   The state's response to discovery did not include as part of Roberts's oral statement that he had left the scene because he was scared and that he had no medical record of his injury.   But Roberts testified at trial that he had left because he was scared.   He also put on evidence through the testimony

---

23.  See *State v. Juarez* (July 17, 1998), Hamilton App. No. C–970368, unreported, 1998 WL 397375, citing *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

24.  See *State v. Combs* (1994), 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211–212, quoting *Lockhart v. Fretwell* (1993), 506 U.S. 364, 370, 113 S.Ct. 838, 844, 122 L.Ed.2d 180, 189–190.

25.  See *Strickland v. Washington* (1984), 466 U.S. 668, 690, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674, 695.

of eyewitnesses as to the extent of his injuries. Further, even though trial counsel did not object to the testimony of Officer Richter because he had not been on the witness list, the trial court gave counsel an opportunity to interview the officer before he would be allowed to testify. Concluding that Roberts has failed to demonstrate that he was denied effective assistance, we overrule his seventh assignment.

### III. Conclusion

We affirm Roberts's conviction. Although the trial may not have been perfect, we cannot conclude that Roberts was denied a fair trial or that the outcome of the trial would have been different but for the errors made.

*Judgment affirmed.*

SHANNON, J., concurs.

WINKLER, J., concurs in judgment only.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.