[Cite as *Middleburg Hts. v. Brown*, 2024-Ohio-3193.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF MIDDLEBURG HEIGHTS,     :

     Plaintiff-Appellee,      :

        No. 113526

     v.          :

PANAGIOTA BROWN,      :

     Defendant-Appellant.      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 22, 2024

---

Criminal Appeal from the Berea Municipal Court
Case No. 2021-CRB-00735

---

### *Appearances:*

Myra Staresina Severyn, Assistant City Prosecutor and Assistant Director of Law, *for appellee.*

Stephen McGowan, *for appellant.*


MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Panagiota Brown ("Panagiota") appeals her conviction. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On June 10, 2021, the City of Middleburg Heights ("the City") filed a complaint against Panagiota alleging domestic violence in violation of R.C. 2919.25(A). The complaint alleged that on June 9, 2021, in Middleburg Heights, Ohio, Panagiota knowingly caused physical harm to her husband, Z.B., with whom she has a minor child, by shutting a car door on Z.B.'s arm resulting in bruising and scratching him on the left side of his face.

{¶ 3} On that same date, Panagiota pleaded not guilty and was released on personal bond, and the trial court issued an order of protection limiting Panagiota's interactions with Z.B.

{¶ 4} On September 2, 2021, Panagiota waived her right to a speedy trial, and on October 25, 2021, Panagiota requested a trial by jury. Over a year later, on February 21, 2023, Panagiota filed a notice of self-defense pursuant to Crim.R. 12.2, a motion to compel additional discovery on self-defense, and a motion in limine, and on March 7, 2023, the trial court conducted a hearing on those motions. On March 14, 2023, the City sought an order compelling Panagiota to produce a complete, unedited, and unredacted copy of the videotape Panagiota secured during the June 9, 2021 incident. The trial court denied the City's motion but ordered Panagiota to provide the prosecution with a copy of the videotape prior to trial if she intended to use the recording. The video was not provided to the City prior to trial nor was it introduced at trial.

{¶ 5} The trial court commenced a jury trial on August 9, 2023.

{¶ 6} The evidence demonstrated that on June 9, 2021, Z.B. parked his truck in the Middleburg Heights McDonald's parking lot and waited for Panagiota so that they could conduct the court-sanctioned exchange of their six-year-old child, G.B., for visitation. While the trial court ordered the exchange of G.B. to occur inside the McDonald's restaurant, Z.B. stated some exchanges prior to June 9, 2021, occurred with Panagiota remaining in her vehicle, and Z.B. removing G.B. from the back seat.

{¶ 7} Z.B. stated that Panagiota arrived and exited her vehicle, and G.B. kept locking the rear driver's side door so that his mom could not open the door. Z.B. stated that he saw Panagiota step back about 15-20 feet from her vehicle and use her telephone to videotape G.B. as she did at every exchange. Z.B. interpreted Panagiota's actions as a nonverbal invitation to remove G.B. from her back seat. Z.B. conceded Panagiota did not grant him verbal permission to enter her car, but he did not recall her telling him to "get away from her car." Tr. 24.

{¶ 8} Z.B. testified that he approached Panagiota and asked her twice to unlock the vehicle with her key fob, and Panagiota failed to respond. Z.B. stated that he reached through the driver's side door, unlocked and opened the back door, and began to unbuckle G.B. Z.B. further stated that Panagiota approached the vehicle and closed the car door on him while his torso was inside the vehicle, causing the door to strike his back.

{¶ 9} Z.B. further testified that as he walked to his truck with G.B. in his arms, Panagiota walked behind him striking his arms and forehead and asking that

he hand over their son to her. Z.B. stated that after he buckled his son into his truck, he realized that he left G.B.'s shoes in Panagiota's vehicle. Z.B. stated he could see the flip flops in Panagiota's vehicle — where the back door was still open; Z.B. further stated he pointed to the shoes and asked if Panagiota could grab them to which she responded negatively.

{¶ 10} According to Z.B., he slowly walked to Panagiota's vehicle, reached in for G.B.'s shoes, and Panagiota slammed the car door on his arm. Z.B. further stated that he retrieved the shoes, said a few curse words, and headed back to his truck; Z.B. conceded he was very upset. Z.B. testified that before he could enter the driver's seat of his truck, Panagiota had retrieved G.B. from his back seat and returned to her vehicle with him. Z.B. called the police at that point, and upon their arrival he described the events as he testified at trial.

{¶ 11} Z.B. stated a police officer obtained photographs of him that accurately depicted the scratches on his forehead and arms caused by Panagiota scratching him as well as mild contusions on his left arm from when Panagiota slammed the door on him. Z.B. further testified that following the incident his forearm hurt and he obtained x-rays that were negative for fractures and his left shoulder hurt him for about one month.

{¶ 12} Patrolman Nicholas Spronz ("Patrolman Spronz"), a member of the Middleburg Heights Division of Police, was dispatched to the Middleburg Heights McDonald's where he interviewed Z.B., Panagiota, and an independent witness.

According to Patrolman Spronz, Z.B. informed him of the same sequence of events as he testified to at trial.

{¶ 13} Patrolman Spronz provided this summary of his conversation with Panagiota:

> Ms. Panagiota advised me that she arrived on scene, she stepped away from her vehicle, began filming. [Z.B.] came up, removed [the child] from the vehicle, returned to grab shoes. She stated at this point she told him she did not want him going inside of her vehicle. She stated that [Z.B.] went into the vehicle regardless, grabbed the shoes, and she did state that she attempted to close the door on him while he was inside the vehicle accessing it.

Tr. 46-47. Patrolman Spronz further testified that Panagiota did not state the incident was an accident and did not deny that she slammed the car door on Z.B.'s body and arm.

{¶ 14} Patrolman Spronz testified that Panagiota showed him the video she secured on her telephone during the exchange with Z.B., and he described what he saw on the video recording. Patrolman Spronz recalled that the video depicted Z.B., from the waist up, inside the vehicle with Panagiota standing over him filming the incident. Patrolman Spronz stated he observed the car door repeatedly opening and closing on Z.B. as Z.B. attempted to remove G.B. from the vehicle. Patrolman Spronz testified that he then saw Z.B. exit the vehicle with G.B. in his arms, and Panagiota walked behind, verbally berating Z.B. and grabbing at either Z.B. or G.B. Patrolman Spronz testified that the scratch Z.B. received above his eye was consistent with the contact between the couple as they walked across the parking lot. Patrolman Spronz stated he saw Z.B. place G.B. in his vehicle and return to Panagiota's vehicle where,

as he reached inside, Panagiota shut the door on his arm. Patrolman Spronz stated he saw Panagiota slam the car door on Z.B. between three and six times, and he observed Z.B. shake his hand and return to his vehicle. Patrolman Spronz further stated he requested a copy of Panagiota's video but never received a copy.

{¶ 15} Patrolman Spronz stated he did not recall Panagiota telling him that her actions were intended to protect herself or G.B. or that she perceived Z.B. as an imminent threat. Patrolman Spronz testified it was his impression that Panagiota shared the video with him in an attempt to demonstrate Z.B.'s wrongdoing.

{¶ 16} Patrolman Spronz obtained photos that he testified fairly and accurately depicted the injuries Z.B. allegedly sustained when Panagiota closed the car door on him and scratched his face. Patrolman Spronz stated he observed a small laceration above Z.B.'s eyebrow, redness around his eye, and a bruise and abrasion on his left forearm, and the injuries were consistent with the acts he observed on Panagiota's video. Pursuant to Patrolman Spronz's investigation, he determined Panagiota was the primary aggressor and she was arrested and charged with domestic violence.

{¶ 17} Panagiota also provided her version of the events. Panagiota testified that she and Z.B. had court-ordered visitation and the exchange of G.B. was to occur inside McDonald's where there is surveillance. Panagiota testified that on a few occasions prior to June 9, 2021, Z.B. would approach her parked vehicle to retrieve G.B. rather than meet inside the restaurant.

{¶ 18} Panagiota testified that upon arrival at McDonald's, Z.B. approached her vehicle and she told him to get away from her car. She further stated that Z.B. left her vehicle but returned within a minute and began jiggling her car door handle. Panagiota stated she was frightened and exited her vehicle, leaving the front driver's side door open. Panagiota testified that she was scared "because of the paper we can't talk about" — which may have been a reference to a court order that was in effect since 2015, prohibiting Z.B. from entering Panagiota's car — and also attributed her fear to the fact that Z.B. was allegedly hurting G.B. when he removed him from her back seat. Tr. 118. No other testimony indicated Z.B. harmed G.B.

{¶ 19} Panagiota denied there was any confrontation between her and Z.B. as he walked towards his truck with G.B. in his arms. Panagiota described the events that occurred after Z.B. moved G.B. to his truck:

> Okay. So [Z.B.] takes my son into his truck and then he comes back and he's yelling profanities, screaming. He comes over to the median and he's looking, left, right, he's doing this, and just, you know, throwing insults. He's six-foot-two, I'm five-five, and he starts veering to the car. And I tell him, stay away from my vehicle. And he's still yelling and screaming. Opens the door. And I went to go shut the door.

Tr. 109. Pangiota stated she told Z.B. to stay away from her vehicle but Z.B. entered her vehicle, and she then struck him with the car door. Panagiota stated Z.B. did not ask her for G.B.'s shoes until after she closed the car door on him.

{¶ 20} Upon further questioning, Panagiota testified that she did not deliberately hit Z.B. with the car door, and she denied touching Z.B. or granting him permission to enter her vehicle.

{¶ 21} Panagiota admitted that on the day of the altercation with Z.B. she showed Patrolman Spronz the video recording she took that day, but stated that Spronz was mistaken if he testified that he observed in the video Panagiota recording the video on her telephone, Panagiota walking with Z.B. and grabbing him, or Panagiota striking Z.B. three to six time with the car door.

{¶ 22} Monica Kerstetter ("Kerstetter"), an employee at the Middleburg Heights McDonald's, observed Panagiota and Z.B. at the restaurant on June 9, 2021. Kerstetter testified that she had seen the couple exchange G.B. on prior occasions when the couple would typically park on opposite sides of the parking lot and hand the child to one another.

{¶ 23} On June 9, 2021, Kerstetter was on a break when she saw Panagiota and Z.B. exchange G.B. Kerstetter testified that she heard yelling and the situation escalated to physical interactions between the parties:

> It was a lot, like he was trying to get the kid out. She hit him with the door a couple times. He finally got the kid out in his car, and he was trying to like get the boy's shoes out of the car, and she was hitting him with the car door. And then in between that she was always yelling at him, having a phone in his face while he was just trying to get the son and get him in the car. And then while she was like — it was just a mess that day.

Tr. 84. Kerstetter called the police based upon her observations.

{¶ 24} Kerstetter testified that she did not see Z.B. take any action that caused her alarm or indicate he would attempt to hurt Panagiota. Kerstetter further testified that the couple were yelling about G.B.'s shoes, and Panagiota's comments seemed petty. Kerstetter stated she did not hear Panagiota grant Z.B. permission to

enter her vehicle. Kerstetter also stated she did not observe Panagiota touch Z.B. while he carried G.B. from her vehicle to his truck. Kerstetter stated she observed Panagiota hit Z.B. twice with the car door — once when Z.B. removed G.B. from Panagiota's vehicle and again when Z.B. returned to the car for G.B.'s shoes.

{¶ 25} Following the close of the City's case-in-chief, Panagiota made a Crim.R. 29 motion for acquittal that the trial court denied. The jury found Panagiota guilty of domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree, and the trial court ordered a presentence investigation. On November 21, 2023, the trial court sentenced Panagiota to ten days of jail, a $100 fine plus all court costs, and two years' probation. Panagiota was also ordered to complete a domestic violence program. On that same day, the trial court stayed imposition of the sentence pending an appeal.

{¶ 26} On December 28, 2023, Panagiota filed a timely notice of appeal presenting three assignments of error:

> Assignment of Error I: The trial court erred when it denied defendant-appellant's motion for acquittal under Crim.R. 29 because the State failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the conviction.
>
> Assignment of Error II: The defendant-appellant's conviction is against the manifest weight of the evidence.
>
> Assignment of Error III: The trial court erred by failing to provide the jury with a written instruction regarding reasonable use of force in ejecting a trespasser for use during their deliberations.

**Legal Analysis**

{¶ 27} In her first assignment of error, Panagiota argues that the trial court erred when it denied her Crim.R. 29 motion for acquittal. Specifically, Panagiota argues she instructed Z.B. to stay away from her vehicle, she was frightened by Z.B., and Z.B. entered her vehicle without permission. Panagiota asserts these acts justified her use of reasonable force to eject Z.B. from her vehicle and, therefore, the City failed to present sufficient evidence to disprove her defense of property.

{¶ 28} Pursuant to Ohio law, self-defense, defense of others, and defense of property are affirmative defenses, and the defenses are related. *State v. Perez*, 2010-Ohio-3168, ¶ 11 (7th Dist.), citing *State v. Martin*, 21 Ohio St.3d 91 (1986); *Perez* at ¶ 14. A sufficiency-of-the-evidence argument is not applicable to review a self-defense claim or, similarly, an affirmative defense of property claim. This court previously found that

> [w]hen reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability. *State v. Martin* (1986), 21 Ohio St.3d 91, 21 Ohio B. 386, 488 N.E.2d 166. A sufficiency challenge is premised upon the quantum of evidence adduced by the prosecution. A defendant's assertion on appeal that he has proven self-defense cannot be a sufficiency claim, but rather, must be reviewed under the standard for a manifest weight claim. *State v. Roberts* (2000), 139 Ohio App.3d 757, 768, 745 N.E.2d 1057.

*Cleveland v. Williams*, 2003-Ohio-31, ¶ 10 (8th Dist.). Thus, we overrule Panagiota's first assignment of error.

{¶ 29} In her second assignment of error, Panagiota contends that the jury's verdict was against the manifest weight of the evidence. A manifest weight challenge questions the credibility of the evidence presented and examines whether the State met its burden of persuasion at trial. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins* at 390. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983), paragraph three of the syllabus. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*.

{¶ 30} R.C. 2919.25(A), the domestic violence statute, provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Panagiota had the burden to prove her affirmative defense: "The burden of going forward with the evidence of an affirmative defense, and the burden of

proof, by a preponderance of the evidence, for an affirmative defense . . . is upon the accused." R.C. 2901.05(A).

{¶ 31} At trial, Panagiota argued both self-defense and defense of property to these charges, but defense of property is the only affirmative defense raised on appeal.[1]

{¶ 32} In the defense of one's property, also known as the defense of ejectment, a property owner may eject a trespasser through the use of reasonable force after the trespasser received notice to depart and fails to do so within a reasonable time. *State v. Childers*, 133 Ohio St. 508 (1938). "To prove the

---

[1] While not specifically stated in her appellate brief, Panagiota stated during oral arguments that in accordance with R.C. 2901.05(B)(2), she was presumed to have acted in self-defense, and the prosecution did not overcome this presumption. We do not find that Panagiota raised on appeal issues related to her claim of self-defense but we will briefly address them here. R.C. 2901.05(B)(2)'s rebuttable presumption applies when a person uses force "that is intended or likely to cause death or great bodily harm." R.C. 2901.05(B)(2). We cannot interpret Panagiota's slamming a car door on Z.B. or scratching his face as the use of deadly harm and, therefore, R.C. 2901.05(B)(2) in inapplicable here.

Additionally, R.C. 2901.05(B)(1) states a person may act in self-defense, defense of another, or in defense of that person's residence, and if "there is evidence presented that tends to support that the accused person used the force in self-defense, . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense . . . ." R.C. 2901.05(B)(1). In other words, if evidence at trial supports that Panagiota used nondeadly force in self-defense, "the state must prove that (1) [Panagiota] was at fault in creating the situation giving rise to the affray in which the force was used or (2) [Panagiota] did not have reasonable grounds to believe or an honest belief that . . . she was in imminent danger of bodily harm or (3) [Panagiota] used more force than was reasonably necessary to defend against the imminent danger of bodily harm." *State v. Jacinto*, 2020-Ohio-3722, ¶ 46 (8th Dist.). A review of the record — particularly the testimony of Kerstetter, an independent witness, and Patrolman Spronz who viewed the video recording filmed by Panagiota and spoke with all witnesses — shows that the City demonstrated beyond a reasonable doubt that Panagiota did not have reasonable grounds to believe she was in imminent danger or bodily harm and, thus, Panagiota's self-defense claim lacked merit.

affirmative defense of defense of property, the defendant must present evidence that he reasonably believed his conduct was necessary to defend his property against the imminent use of unlawful force, and the force he used in defense was not likely to cause death or great bodily harm." *State v. Fields*, 2016-Ohio-8212, ¶ 35 (7th Dist.), citing *State v. Moses*, 2014-Ohio-1748, ¶ 41 (10th Dist.); *see State v. Howell*, 1987 Ohio App. LEXIS 9348, *8 (5th Dist. Oct. 26, 1987 ) ("The property owner has the common law right of ejecting, by use of reasonable force, trespassers upon his property. Such reasonable force is in fact a defense to a charge of assault."). "In determining whether there are reasonable grounds for believing there was an imminent threat of great bodily harm, the court can consider whether the defendant received prior threats or encountered prior trespassers." *State v. Ludt*, 2009-Ohio-416, ¶ 25 (7th Dist.), citing *State v Fields*, 84 Ohio App.3d 423, 428 (12th Dist. 1992).

{¶ 33} Here, the parties do not dispute that Panagiota's property — her vehicle — was owned by her. Reviewing the evidence in this case, we conclude that Panagiota's affirmative defense of defense of property is not supported by a preponderance of the evidence.

{¶ 34} Pangiota testified that she was frightened by Z.B. because of an outstanding court order that prevented Z.B. from accessing her vehicle and because she believed Z.B. was harming G.B. as he unbuckled him in her back seat. Panagiota testified that when Z.B. returned to her car to retrieve G.B.'s shoes, she instructed him to stay away from her vehicle but he did not cooperate. Panagiota further

testified that she struck Z.B. once with the car door and any testimony to the contrary was incorrect.

{¶ 35} Panagiota's testimony was in contrast to that presented by Z.B., Patrolman Spronz, and independent witness Kerstetter. And the testimony from those witnesses was, for the most part, consistent with Z.B.'s version of the events that took place on June 9, 2021.

{¶ 36} We note that any fear Panagiota had related to the alleged physical harm of G.B. did not reasonably justify Panagiota attempting to eject Z.B. from her vehicle when he returned for G.B.'s shoes. At that time, G.B. was buckled into Z.B.'s truck, and Panagiota could not claim any potential harm to her son.

{¶ 37} Further, Panagiota did not offer a reasonable explanation as to why she believed it was necessary to shut her car door on Z.B. to defend her vehicle when Z.B. returned to Panagiota's vehicle to retrieve G.B.'s shoes. Z.B. testified that he asked Panagiota for the child's shoes before he walked to her car to pick them up but she refused to assist him. Independent witness Kerstetter testified that she could hear the couple arguing about their child's shoes, and she heard Panagiota state, "[Y]ou can go buy him shoes" or "[Y]ou don't need the shoes that I have." Tr. 86. Kerstetter testified that she did not observe any behavior to suggest Z.B. would harm Panagiota or her vehicle nor did Patrolman Spronz testify to such observations. Following his interviews with the parties and viewing Panagiota's recording of the incident, Patrolman Spronz believed Panagiota was the primary aggressor and engaged in domestic violence.

{¶ 38} A review of the record demonstrates that the factfinder did not lose its way and create a manifest miscarriage of justice in finding Panagiota guilty of domestic violence. Further, her conviction is supported by substantial, credible evidence upon which the jury could reasonably have concluded that the elements of Panagiota's claim of defense of property were not proven by a preponderance of the evidence. Thus, we overrule Panagiota's second assignment of error.

{¶ 39} In her third assignment of error, Panagiota contends that the trial court erred when it failed to provide the jury with a complete set of written jury instructions for use during their deliberations. Specifically, Panagiota argues the exclusion from the written instructions of the paragraph on the defense of property prejudiced her and denied her the fundamental right to a fair trial.

{¶ 40} Crim.R. 30 governs jury instructions. Crim.R. 30 requires the trial court to "reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record."

{¶ 41} Panagiota did not object to the trial court's written jury instructions on this basis below. Accordingly, we review this claim for plain error. Crim.R. 30; Crim.R. 52(B). Under Crim.R. 52(B), a plain error affecting a substantial right may be noticed on appeal even though it was not brought to the trial court's attention. To constitute plain error, there must be an error that is plain or obvious that affected the outcome of the case. *In Re: J.G.*, 2013-Ohio-583, ¶ 10 (8th Dist.), citing *State v.*

*Barnes*, 94 Ohio St.3d 21, 27 (2002); *State v. Harrison*, 2009-Ohio-3547, ¶ 61 (an error rises to the level of plain error only if, "'but for the error, the outcome of the trial clearly would have been otherwise'"), quoting *State v. Long*, 53 Ohio St.2d 91, 97 (1978). Notice of plain error "'is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *Barnes*, quoting *Long*.

{¶ 42} Following the introduction of evidence at trial, the trial court read the jury instructions to the panel, including the following paragraph on the defense of property:

> A defendant has a common law right to eject another from their property including a vehicle by using reasonable force if the defendant has a reasonable belief of a threat to that property or that the other person would remain on or in the property in contradiction to their direction to leave. The defendant must give another a verbal or a written warning or notice to leave and must give a reasonable time for response to that request.

Tr. 145.

{¶ 43} Contained in the record is a set of jury instructions ("written jury instructions") that are presumably the written jury instructions provided to the jury during deliberations. The written jury instructions do not include the above-referenced paragraph on the defense of property.

{¶ 44} The trial court charged the jury with all relevant jury instructions, but failed to fully comply with Crim.R. 30 when it provided the jury with an incomplete set of written jury instructions. "'The proper procedure is for the trial court to explicitly follow Crim.R. 30 when instructing a jury.'" *State v. Singleton*, 2013-Ohio-

1440, ¶ 22 (8th Dist.), quoting *State v. Comen*, 50 Ohio St.3d 206, 210 (1990). However, even where the trial court fails to fully comply with Crim.R. 30, absent prejudice there is no reversible error. *Singleton.*

{¶ 45} Pursuant to our review of the record and our manifest weight of the evidence analysis, it cannot be reasonably argued that had the full set of written jury instructions been submitted to the jury, the outcome of the case clearly would have been different. *See State v. Wiley,* 2014-Ohio-27*,* ¶ 56 (8th Dist.) ("Although the trial court did not comply with Crim.R. 30(A), Wiley has not demonstrated that the trial court's failure rises to the level of plain error, i.e., that if the court had provided all of its instructions in writing to the jury, the outcome of the trial would have been different.); *State v. Demecs*, 2006-Ohio-3802, ¶ 22 (6th Dist.) (Where it could not be reasonably argued that the outcome of the trial clearly would have been different had the trial court submitted a complete set of jury instructions to the jury, no plain error was demonstrated.). There was abundant evidence to support Panagiota's conviction. Only Panagiota's testimony supported her defense-of-property claim, and this was contradicted by the testimony of Z.B., Patrolman Spronz, and independent witness Kerstetter. Thus, Panagiota's third assignment of error is overruled.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Berea Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
EMANUELLA D. GROVES, J., CONCUR