OPINION.
{¶ 1} Appellant John P. Broe was convicted of murdering his wife, Shannon Broe, and the 5-month-old fetus she carried. (Because appellant and his murdered wife share the same surname, we refer to them by their first names.) A jury found John guilty of two counts of aggravated murder in violation of R.C. 2903.01(A) and one count of tampering with evidence in violation of R.C. 2921.12(A)(1). The trial court sentenced John to life imprisonment with parole eligibility after twenty years for each of the aggravated murders and to five years' incarceration for tampering with evidence. It ordered the sentences to be served consecutively.
{¶ 2} John raises seven assignments of error. He contends that the trial court erred by (1) overruling his motion to suppress the statements that he had made to the police; (2) denying his motions for a mistrial and for curative instructions following the state's deliberate elicitation of hearsay; (3) erroneously admitting expert opinion evidence about the cause of the fetus's death; (4) denying his Crim.R. 29 motion and accepting the jury's verdict where the evidence was insufficient to support his conviction for aggravated murder in connection with the unlawful termination of a pregnancy; and (5) denying his motion for a mistrial in response to prosecutorial misconduct. In his last two assignments, John claims that he was denied the effective assistance of counsel and that the record fails to support the imposition of maximum, consecutive sentences.
{¶ 3} We affirm the conviction and the two consecutive life sentences, but modify the sentence for tampering with evidence.
I. John and Shannon's Relationship
{¶ 4} John and Shannon met when they were in their early teens and had been married almost two years on the morning that John killed her. Shannon was employed as a clerk in a retirement community, and John worked at a shoe store. Shannon was 24 years of age and expecting the couple's first child in four months. She had made preparations for the birth of the child, had chosen a name, had bought baby clothing, and had designed the nursery.
{¶ 5} Shannon and her family were very close. She and her mother, Sharon Nolan, spoke to each other several times every day. John and Shannon lived in a home purchased from Shannon's parents, and Shannon drove a car that had belonged to Nolan.
{¶ 6} The couple had been experiencing marital problems for several months. In fact, John had moved out of their home for a two-month period approximately six months before he killed Shannon. And John had been having an affair with a co-worker, who was also pregnant.
II. Shannon's Disappearance
{¶ 7} The last time Nolan saw Shannon was Tuesday, September 4, 2001, when Shannon joined her parents and siblings for dinner at Nolan's home. That night Shannon prepared a list of persons to invite to her baby shower, and the family traveled to a store to see the items that Shannon had chosen for the nursery. The last time Nolan spoke to Shannon was the following Thursday when Shannon called to tell her that she had arrived home from work.
{¶ 8} The next morning Nolan learned that Shannon had failed to appear for a doctor's appointment. When Nolan called Shannon's employer, she learned that Shannon had failed to come to work. When she received no response to messages she had left on Shannon's home and cellular telephones, Nolan called John's cellular telephone. John said that he had been called into work and had not noticed whether Shannon had been home the previous evening. He had assumed that she was sleeping upstairs. John had slept in the downstairs bedroom. John later told Nolan that he and Shannon had argued during a telephone conversation the previous evening.
{¶ 9} Nolan asked John to look for Shannon in the house. He called Nolan and told her that Shannon's wallet, purse, and cellular telephone were present, but that Shannon was not there. Nolan told John to wait for her arrival.
{¶ 10} Nolan drove to the house. Discovering that no one was home, she entered the house with her set of keys. When she called John's cellular telephone, he answered, explaining that he had left to purchase cigarettes. After calling Shannon's friends and family, Nolan called the police.
{¶ 11} Family and friends searched for Shannon over the weekend. According to Nolan, John seemed unconcerned. He stayed in the basement washing clothes and talking to co-workers on his cellular telephone. When Nolan asked John to help her search for Shannon, he accompanied her to two houses and then left.
{¶ 12} On Monday, Nolan received a telephone call from John asking her if the police had been there. She told him that three officers had been to her house and that her husband had told them that John was at work. John told her that two officers were at the shoe store asking him to leave with them. Later that day, several police officers and clergy informed Nolan that they had found Shannon's body.
III. John's Statements
{¶ 13} According to John's confession, he and Shannon had been arguing on Thursday, and she had told him that she would not be home after work. When John returned home, his girlfriend met him there. She left early Friday morning. Soon after his girlfriend left, Shannon returned home. When she asked if John's girlfriend had been in the house, John, to anger Shannon, told her that he and his girlfriend had engaged in sexual intercourse. He and Shannon began arguing. Shannon took a knife with a five-inch blade from the kitchen and advanced toward him. He picked up a child's aluminum bat from the top of a dresser located in the first-floor bedroom. He warned Shannon that if she came near him he would hit her with the bat. He shoved her away from him twice. The third time she came toward him, John swung the bat in an attempt to hit Shannon's shoulder. Instead, he hit her "square in the middle of the face." She fell on the bed. When she started to get up and to come at him again, John swung and hit Shannon in the head several times.
{¶ 14} John then brought a plastic bin from the basement and placed Shannon's body in it. After he took her body to the basement, he cleaned blood from the bedroom curtain, a wall, the ceiling, the windowsill, and the top of the window. He then backed his car down the driveway, opened the garage door, and placed the bin containing Shannon's body in the trunk of his car. He put the bloody sheets and pillow, and the clothes that he had been wearing in a garbage bag. He disposed of the bag and the baseball bat in a location that he could not recall. He drove off an interstate exit ramp and hid the bin containing Shannon's body in some underbrush. On the way home, John received a call on his cellular telephone asking him to report to work.
{¶ 15} Saturday night, John returned to where he had concealed Shannon's body and buried it with a shovel that he had taken from his grandfather's storage facility. (He later hid the shovel at the shoe store.) He then cleaned his car, returned home, and, after taking a shower, sat down with the family.
{¶ 16} Before his confession, John had spoken to the police several times in relation to Shannon's disappearance. On the Friday following Shannon's disappearance, he spoke at his house to police officers who had responded to Nolan's call reporting that Shannon was missing. Cincinnati Police Officer Stephen Bender talked to John at the house and noted that John had a fresh scratch on his neck. When he asked John about the scratch, he denied being aware of it. John also denied any recent physical confrontation with Shannon.
{¶ 17} On Saturday, John brought pictures of Shannon to Cincinnati Detective Steve Ventre of the Personal Crimes Unit. Ventre interviewed him about Shannon's disappearance. Ventre asked John about the scratch noted on the missing-persons report, but did not see it on John at the time they spoke.
{¶ 18} Cincinnati Police Specialist Paul Von Holle interviewed John on Monday. He provided John with his Miranda rights, and John indicated that he understood them. John told the officer that he and Shannon had not been getting along, and that Shannon was depressed and had been talking about divorce. He also said that he had been dating a woman and that the woman had come over to the house for several hours in the early morning hours of September 7. He denied ever striking Shannon. After speaking with John, Von Holle talked with an unidentified person who informed him that homicide investigators were coming to talk to John.
{¶ 19} John asked Von Holle if he could leave. Von Holle took John to a common area. When John asked if any of the investigators could give him a ride home, Von Holle told him to take a seat and that the investigators would be with him soon.
{¶ 20} Police Specialist Greg Ventre and Police Officer Darrin Hoderlein arrived to speak with John. John was brought into an interview room. Upon learning that John had a four-year college degree, Ventre read him his Miranda rights, which John acknowledged in writing. At some point during the interview, before John confessed to murdering Shannon, he asked Ventre's advice about whether he should have an attorney. According to Ventre, he told John that he could not tell him whether he should have an attorney, and John never asked for an attorney. John told Ventre that he understood his rights. He subsequently confessed to Shannon's murder and told the officers where her body could be found.
{¶ 21} After telling the police officers where he had buried Shannon's body, he directed the police to the location. John was then transported back to the Criminal Investigation Section, where he was provided with food. Meanwhile, the police, in the company of the coroner, retrieved Shannon's body and the nearby bin.
IV. The Investigation
{¶ 22} The police went to Shannon and John's house, where they discovered six bottles of cleaner, a spot of blood on the tag attached to the plug of a lamp located in the downstairs bedroom, and John's muddy tennis shoes. They also found a tarry substance on the bottom of John's car that was similar to the substance found at the burial sight. Later, more blood was found in the bedroom. And the doorframe to the basement was chipped at a height that corresponded to the top of a bin similar to the one that had contained Shannon's body.
V. The Coroner's Report
{¶ 23} Hamilton County's Chief Deputy Coroner, Dr. Robert Pfalzgraf, determined that Shannon's body contained a five-month-old fetus. He opined that Shannon had died from brain injuries due to blunt impacts to the head with open skull fractures. He further opined to a reasonable degree of medical certainty that the fetus had died of intrauterine hypoxemia or "lack of oxygen due to the bludgeoning death of the mother." He also testified that a toxicology test revealed that Shannon had an ethyl alcohol level of .166g/100ml in her muscle, which was consistent with decomposition of her body. But he admitted that he did not know whether the .166g/100ml reading was from decomposition or from the consumption of alcohol.
VI. John's Motion to Suppress
{¶ 24} In his first assignment, John challenges the trial court's denial of his motion to suppress. Specifically, he argues that he was depressed and medicated, and that questioning improperly continued after he had requested to leave and after he had inquired about counsel. Before his trial, John had moved to suppress any statements that he had made to the police, as well as any evidence seized as a result, contending that he had not been properly told of his Miranda rights and that the interrogations were improper. The trial court denied his motion, finding that John had been properly advised of his Miranda rights and that he had knowingly, intelligently, and voluntarily waived them.
{¶ 25} As a reviewing court, we must give great deference to the trial court's findings of historical facts when responding to a challenge to a ruling on a motion to suppress.[1] We must "independently determine, as a matter of law, however, whether the facts meet the appropriate legal standard."[2] Further, "[u]nder Miranda v. Arizona,[3]
the state may not use incriminating statements made during a custodial interrogation unless it proves that procedural safeguards resulted in the defendant's voluntary waiver of his constitutional privilege against self-incrimination. * * * Where a defendant is entitled to these procedural safeguards, or Miranda warnings, and the state has failed to inform the defendant of his rights, any incriminating statements made during a custodial interrogation must be suppressed at trial."[4]
{¶ 26} At the suppression hearing, Officer Bender testified that he was at John's home in response to a call by Nolan. When John arrived, Bender interviewed him about Shannon's disappearance, the state of their marital relationship, and the scratch on John's neck. According to the officer, John was not in custody and voluntarily showed him and the other officers around his home. Miranda rights were not required, and, thus, suppression was not warranted for any statements John made at that time.
{¶ 27} Detective Steve Ventre testified that he had interviewed John when he voluntarily came to his office with Shannon's photograph. He asked John about his marital relationship and where he thought Shannon might have gone. John was not in custody, and Miranda warnings were not required. Thus, John's statements at this point need not have been suppressed.
{¶ 28} Police Specialist Roger Webster testified that he had located John at his place of employment for the purpose of getting him to submit to a polygraph examination to eliminate him as a suspect. John went voluntarily with the officer to the police station. He was placed in a room, and he was provided with his Miranda rights and stated that he understood them. He then took the polygraph examination. After the examination was completed, Officer Webster asked the homicide investigators if they wanted to speak to John. When they responded affirmatively, Webster asked John if he would mind answering some questions for the homicide investigators. John agreed to do so. Webster then took John to the interview room in the homicide unit.
{¶ 29} Cincinnati Police Officer Laurie Wobster accompanied Webster to pick up John. She observed some of the polygraph examination. She prepared a summary of a telephone conversation that she overheard John having while he was standing in a hallway outside the interview room and waiting for the homicide detectives to interview him. The statements overheard by Wobster were made in a hallway and without elicitation by police. They were not made in circumstances requiring suppression.
{¶ 30} Von Holle testified that he administered the polygraph examination. He first advised John of his Miranda rights. He ascertained that John was a college graduate. He then reviewed each of the rights with John and asked him to initial the notification-of-rights form before each stated right to indicate that he understood them. Van Holle testified that John had understood his rights and that he had waived them. Van Holle stated that he had made no threats or promises, that John had not requested an attorney, and that he had spoken voluntarily. He also told John that he was free to go at any time. John told him that he had not taken any medication or drugs. Von Holle then administered the examination. Van Holle explained that a notification about Miranda rights was provided to everyone who took a polygraph test, whether the person was a victim, a suspect, or a witness.
{¶ 31} Von Holle informed John that he had failed the test. Approximately 10 minutes later, John asked if he could leave. John walked out the door and asked if he could have a ride from one of the investigators. Van Holle responded, "Yeah. Have a seat in the lobby." Van Holle then spoke to another polygraph examiner who was outside the office. Someone then told the homicide investigators that John had failed the test. John was then taken upstairs. John had agreed to answer some questions, according to Webster.
{¶ 32} Greg Ventre and Hoderlein were called in from a search for Shannon to interview John. They were told that John was willing to do an interview with them. Ventre ascertained John's degree of education and advised him again of his Miranda rights by reading them to him. John stated that he understood the rights and signed the waiver form. The officers then interviewed him for one and one-half hours before taking a break to provide John with a drink. Just prior to the break, John asked Ventre, "Should I have an attorney?" Ventre told him that it was not his place to advise him whether he should have an attorney, that John had advised him that he had understood his rights, and that if there were any part of his rights that John did not understand, Ventre would attempt to provide a clarification. According to Ventre, John never requested an attorney.
{¶ 33} Once the interview started again, Ventre asked John if Shannon was someplace where she could be found. John wanted to know if that information would be an admission of guilt. John subsequently told the police where Shannon's body could be found and that he had killed her. He was told that he was not free to leave. Eventually another break was taken, and then John recorded his statement on tape. Ventre denied that John had been made any promises or had been threatened. He claimed that John had spoken voluntarily.
{¶ 34} Officer Donald Feldhaus testified that he had been sent to find the shovel at John's place of business. He was holding the shovel at the police station when John was being led from the interview room. When he asked John if it was the shovel that he had used, John told him, "No." John told him the shovel he had used was smaller and told him its exact location at the shoe store.
{¶ 35} As to the statements made at the police station, following the failed polygraph examination, the evidence clearly showed that John had indicated that he was not medicated at the times he spoke with the police officers. The record fails to demonstrate that he was depressed to the extent that he could not voluntarily waive his Miranda rights. The record does show that John followed Von Holle's orders to sit and wait for the investigators when he asked for a ride from the police station after having failed the polygraph test. Even if we assume that John was not free to leave at that point, the record demonstrates that he had been provided with his Miranda rights and had waived them. Contrary to John's assertion, he did not invoke his right to remain silent by asking if he could leave and requesting a ride. He agreed to speak to the officers and voluntarily did so. Further, John's statement asking Ventre whether he should contact an attorney was not a clear and unambiguous request for an attorney.[5] Accordingly, because we find no error in the denial of his motion to suppress, we overrule John's first assignment.
VII. Hearsay
{¶ 36} John's second assignment challenges the trial court's failure either to grant a mistrial or to give a curative instruction based on the state's deliberate elicitation of hearsay evidence from Nolan. Whether to grant a mistrial lies within the trial court's discretion.[6] "[A] mistrial should be declared `only when the ends of justice so require and a fair trial is no longer possible.'"[7] Whether to provide a curative instruction also rests in the trial court's discretion.[8]
{¶ 37} But before we can determine whether the trial court abused its discretion in denying John's requests, we must first determine whether the contested statements were hearsay. If they were, we must then determine whether the statements were admissible under some exception. Our next task, if the statements were inadmissible, is to determine whether their admission was prejudicial to John. This court has explained, "On determining the effect of erroneously admitted hearsay, [we] must determine whether, in the absence of the inadmissible evidence, the evidence in favor of conviction was so overwhelming that the improperly admitted evidence was harmless beyond a reasonable doubt."[9]
{¶ 38} The record demonstrates that the assistant prosecutor asked Nolan if John was the father of a fetus Shannon had previously aborted. She replied, "Yes," before John could object. The trial court sustained the objection after it was made. When the assistant prosecutor asked about Shannon's reaction to the abortion, Nolan began, "Shannon told us that they," before John objected. His objection was sustained. When the assistant prosecutor asked if Nolan had been aware of marital problems between John and Shannon, Nolan responded that Shannon had told her in March that there were problems. The trial court sustained John's objection to that statement.
{¶ 39} When the assistant prosecutor asked Nolan how she was aware that there were problems, Nolan explained, "She was very unhappy. She started becoming very depressed. She would come to family get-togethers without John. She would make up the excuse that he was always working. We did realize — I did realize later he was not working. He wasn't coming home very often. He decided to move out of the home. He did so on April 13th of 2001. He moved out of their home and moved to Kentucky to live with a co-worker, and lived there approximately two months. She was just unhappy. She was very worried about money. They purchased that home a year before from us. There were bills to be paid, and John had left her with all the bills to be paid; that was something she could not do on her own, so, that's something that was really getting her more depressed and more emotional, knowing that she could lose her home." John objected, arguing hearsay. The trial court sustained his objection, but overruled his motion to strike all the testimony.
{¶ 40} The assistant prosecutor asked Nolan if she was aware of where Shannon slept. Nolan responded, "Yes." When asked about which bedroom, Nolan responded, "He told me she slept * * *," before John interrupted with an objection. Nolan continued her statement over the objection by saying, "Shannon slept in the blue bedroom * * *." No ruling was made on the objection. Nolan explained that the blue bedroom was the only bedroom on the first floor.
{¶ 41} When Nolan subsequently started to say what Shannon had told her the last time she had called Nolan, John objected. The assistant prosecutor then asked if it was Nolan's understanding that Shannon was going to bed. John objected and asked for a sidebar, where he moved for a mistrial. John's counsel stated that he "was concerned the prosecution is intentionally asking questions they know are improper. They are intentionally trying to elicit what any first-year law student would understand to be blatant hearsay, and they are much too experienced not to understand the prejudicial nature of their conduct, that is an intentional act, prosecution act, to put before this jury for evidence otherwise not admissible."
{¶ 42} The assistant prosecutor responded, "[T]he State has a heavy burden here. We need to establish some timing in order to do our story. It's not so much on the truth of the matter but just to establish the procedure here." John's attorney strongly suggested that the purpose of the hearsay was to demonstrate that Shannon had gone to bed the night John murdered her, "when there's absolutely no proof."
{¶ 43} The trial court denied the motion for a mistrial, but admonished the state to "stay away from the hearsay." John then asked for a curative instruction that the jury was not to consider anything Shannon had told Nolan. The trial court refused to give the instruction because, according to the court, not everything had been offered for the truth of the matter asserted, and because "the fact a statement is made is admissible."
{¶ 44} Immediately following the sidebar, the assistant prosecutor asked Nolan what Shannon normally wore to bed, whether she wore underwear, and whether she was in the habit of going outside without underwear. These questions supported John's argument that the hearsay was elicited to support the inference that Shannon was killed in bed, and not in self-defense after she had returned home from being out.
{¶ 45} Hearsay is an out-of-court statement made by a declarant offered in evidence to prove the truth of the matter asserted.[10]
Evid.R. 803 clearly states that hearsay is not admissible unless specifically provided for by the Ohio or United States constitutions, Ohio statutes, Ohio evidence rules, or rules prescribed by the Ohio Supreme Court. Evid.R. 801(D) explains what statements are not hearsay, and Evid.R. 803, 804, and 807 provide exceptions to the hearsay rule. For example, Evid.R. 803(3) allows a statement of a deceased victim's then-existing state of mind or emotional condition because the spontaneity of such a statement makes it more trustworthy.[11] But the testifying witness cannot provide the reasons underlying the victim's state of mind.[12] Further if a statement is being offered for some valid purpose other than its truth, it does not fall within the definition of hearsay.
{¶ 46} None of the exceptions specifically allow hearsay testimony from a decedent's mother to "establish timing" or to "establish procedure." There is no exception to the hearsay rule that would have allowed the statements that John was the father of the previously aborted fetus, that Shannon was not happy about the abortion, and that the couple had begun having marital problems in March to be admitted for their truth. There is no exception that would have allowed evidence of the reasons underlying Shannon's then-existing emotional condition of depression, i.e., that John had left her with unpaid bills. Thus, these statements were inadmissible.
{¶ 47} Concluding that the discussed hearsay statements were inadmissible, we must next determine if they were prejudicial. Several of the hearsay statements by Nolan were contained in John's statement to the police. These included the fact that John had been the father of Shannon's aborted fetus (an irrelevant matter), that they had not had a good marriage, and that he had moved out of the house six month earlier. Thus, although Nolan's statements were inadmissible, they were merely duplicative, and thus not prejudicial. As for Nolan's statements that Shannon was unhappy with the abortion and that John had left her with unpaid bills, we conclude that these were harmless beyond a reasonable doubt.
{¶ 48} As to the statement concerning Shannon's sleeping arrangements, the transcript indicates that Nolan said that "he" told Nolan that Shannon slept in the blue bedroom. Assuming that "he" referred to John as the speaker, the statement was not hearsay as it would have been an admission by him.[13] If we assume that it was not John, we conclude that the admission of the statement was harmless beyond a reasonable doubt. John argues that its admission corroborated the state's theory that Shannon was asleep when he attacked her and undermined his claim of self-defense — that Shannon came into his bedroom to attack him with a knife. In light of the severity of John's attack on Shannon, we conclude that the evidence in favor of conviction was so overwhelming that the admission of the statement was harmless beyond a reasonable doubt. John's claim of self-defense was undermined not by the admission of possible hearsay, but by his hitting Shannon in the head several times with a baseball bat after she had fallen on the bed from the first blow.
{¶ 49} While it might have been the better course for the trial court to have given a curative instruction, we cannot say, in light of our conclusion that the admission of the statements was not prejudicial, that the failure to give such an instruction prejudiced John. Similarly, we conclude that the trial court did not abuse its discretion by failing to declare a mistrial. We overrule John's second assignment.
VIII. The Coroner's Opinion
{¶ 50} John's third assignment challenges the admission of the coroner's opinion of what caused the death of the fetus and the admission of his report containing that opinion. Specifically, John contends that Dr. Pfalzgraf relied on matters outside his personal knowledge and did not specify what those facts or data were. He also challenges the admission of the fetal death certificate because, according to John, Dr. Pfalzgraf"s opinion as to the cause of death was speculative when he had no personal knowledge of any facts surrounding the fetus's death and no other evidence to support his opinion.
{¶ 51} Dr. Pfalzgraf testified that he had performed an autopsy on Shannon's decomposed body. He observed a fetus in her uterus that had been partially pushed through the birth canal due to the pressure of the gas forming in Shannon's body during its decomposition. The fetus, consistent with a five-month gestation period, was dead. Shannon's autopsy report provided a more complete picture of the coroner's observations of the fetus. When asked whether, after observing Shannon and the fetus, he had an opinion to a reasonable degree of certainty as to the cause of Shannon's death, he responded that brain injuries were the cause. When asked about the cause of death of the unborn child, he opined that the fetus had died of "intrauterine hypoxemia, which means lack of oxygen due to the bludgeoning death of the mother."
{¶ 52} He testified that he did not do an autopsy on the fetus "in the true sense of the word," because the body was "partially skeletonized because of decomposition." Concerning the cause of death, Dr. Pfalzgraf stated that while he did not generally determine manner of death for fetuses, he determined as a cause of death what was most likely "based on what he ha[d]." He testified that it was probable that the fetus had died as a result of the blows to Shannon's head. Concerning the scientific evidence to support this, he indicated that babies were unable to live in the uterus when the mother died. He also testified that he did not know whether the fetus was alive at the time John killed Shannon, but that he had no reason to believe that the fetus had died earlier. He also admitted that he could not say with absolute certainty that the fetus was alive at that time.
{¶ 53} As we explained in State v. Harrison,[14] "[a]s with the testimony of any expert witness, a proper foundation must be laid for the coroner's opinion testimony, and the opinion must have the proper evidentiary basis." Under Evid.R. 703, the expert may base his opinion on facts he has perceived or facts that are admitted at trial. Under Evid.R. 705, "The expert may testify in terms of an opinion or inference and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." The provision of the underlying facts or data allows the jury to assess the validity the expert's opinion. Further, "Medical opinion testimony must be based upon a reasonable degree of medical certainty or probability."[15]
{¶ 54} John argues that the coroner failed to specify the facts underlying his opinion. But the coroner observed the fetus during his autopsy of Shannon. He testified that in his opinion the fetus had died because of a lack of oxygen. He also testified that the stated cause of death was the most probable cause based on scientific evidence that a baby could not live in the uterus when the mother died.
{¶ 55} In John's second argument, he contends that the certificate of fetal death should not have been admitted because the coroner did not perform an autopsy on the fetus and could not establish the cause of death due to his failure to establish that the fetus was alive before John killed Shannon. The coroner's factual determinations concerning the cause of death as expressed in a death certificate create a "nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary."[16] John failed to present competent, credible evidence to rebut the presumptions contained in the death certificate. Thus, the death certificate was properly admitted. Further, we are not persuaded that John should have benefited from the fact that the coroner could not state with absolute certainty whether the fetus was alive before Shannon was killed, when John's unlawful disposal of Shannon's body made it impossible to perform a complete autopsy on the fetus.[17] We overrule John's third assignment.
IX. Sufficiency of the Evidence
{¶ 56} John's fourth assignment challenges the sufficiency of the evidence supporting his conviction for aggravated murder relating to the unlawful termination of Shannon's pregnancy. Specifically he challenges the lack of medical evidence relating to Shannon's pregnancy and the lack of proof that the fetus was alive prior to Shannon's death.
{¶ 57} R.C. 2903.01(A) forbids anyone from purposely and unlawfully terminating another's pregnancy with prior calculation and design. R.C. 2903.09(A) defines unlawful termination of another's pregnancy as "causing the death of an unborn member of the species homo sapiens, who is or was carried in the womb of another, as a result of injuries inflicted during the period that begins with fertilization and that continues unless and until live birth occurs." In reviewing a challenge to the sufficiency of the evidence, we must ask "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[18]
{¶ 58} After examining Shannon and the fetus, the coroner testified that the fetus was killed due to a lack of oxygen caused by the bludgeoning death of Shannon. The coroner admitted that he did not know for certain that the fetus had been alive immediately before Shannon was killed, but he testified that he had no evidence that it had been dead either. John challenges the cause of death because there was no direct evidence that the fetus was alive immediately before John killed Shannon. This is due, in part, to the inability of the coroner to perform an autopsy on the fetus because it had skeletonized before John told the authorities where Shannon's body was located.
{¶ 59} But the causal link between the fetus's death and John's conduct could be proved by evidence other than the coroner's testimony.[19] While it would have been better for the state to have provided the most recent medical evidence of the condition of Shannon's fetus, that evidence would not have addressed the issue John raises — was the fetus alive at the moment John attacked Shannon? The most recent medical evidence would not have directly provided the answer. Only Shannon knew whether the fetus was alive and moving at that moment, and she was not alive to testify. The only other means of ascertaining whether the fetus was alive at that time would have required that Shannon be connected to a fetal monitor with a qualified person reading its output as she was being killed. Thus, the jury had to rely on circumstantial evidence. This it could have done. Circumstantial evidence and direct evidence are of equal evidentiary value, especially because some facts can only be proved by circumstantial evidence.[20]
{¶ 60} There is substantial circumstantial evidence in the record that the fetus was living before Shannon was murdered. The coroner testified that Shannon's fetus was consistent with a five-month gestation period. John told the police that Shannon had been five month's pregnant. From this the jury could have inferred that the fetus had been alive for five months.
{¶ 61} John asked whether his killing of the baby would give rise to an additional charge. Obviously, John believed the fetus was alive. Shannon was preparing for the arrival of the child a few days before she was murdered. The night before she was murdered, her mother informed her that she had bought maternity clothes for Shannon. One month earlier, Shannon had been informed by medical personnel that the baby was a girl. She had chosen a name for the baby. She had a doctor's appointment the day after she was murdered. We conclude that the evidence was sufficient to convict John. We overrule his fourth assignment.
X. Prosecutorial Misconduct
{¶ 62} In his fifth assignment, John alleges that the trial court erred to his prejudice by denying his motion for a mistrial in response to repeated acts of prosecutorial misconduct. He first incorporates the arguments he made in his second assignment. We have answered those arguments by overruling his second assignment.
{¶ 63} He also argues that the trial court should have granted a mistrial or provided a curative instruction when the assistant prosecutor informed the jury in closing argument that the defense had requested that the jury be instructed on self-defense and voluntary manslaughter. No objection was made at this point. Later, the assistant prosecutor argued that the jury would hear an instruction on voluntary manslaughter made at the defense's request. John moved for a mistrial, arguing that it was highly improper for the state to inform the jury that John had requested the voluntary manslaughter and self-defense instructions. The trial court denied the motion and admonished the assistant prosecutor not to "mention it again."
{¶ 64} A motion for a mistrial rests in the court's discretion, and should be granted "only when the ends of justice so require and a fair trial is no longer possible."[21] In viewing a claim of prosecutorial misconduct, we must determine whether the prosecutor's remarks were improper, and if so, whether they prejudicially affected the defendant's substantial rights.[22] If it is clear beyond a reasonable doubt that absent the offending comments the defendant would have been found guilty, the comments are harmless.[23] Thus, if the prosecutor's comments were improper and prejudicially affected John's substantial rights, a mistrial should have been granted.
{¶ 65} We conclude that it was improper for the state to attribute the instructions to John.[24] A requested instruction is not given as an instruction of a party, but is tendered "as an instruction of the court itself and becomes the law of the case."[25] To attribute it to a party "is likely to indicate to the jury that it is not as much an instruction of the court as are other parts of the court's charge." The error was harmless, however, because the evidence was such that John would have been found guilty absent the assistant prosecutor's comments. We overrule John's fifth assignment.
XI. Ineffective Assistance of Counsel
{¶ 66} In John's sixth assignment, he contends that he was denied the effective assistance of counsel. To prevail on his claim, John "must show that counsel's representation fell below an objective standard of reasonableness,"[26] and that he was prejudiced by counsel's deficient performance.[27] Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."[28] If the defendant fails to prove one of the prongs, we need not consider the other.[29]
{¶ 67} John claims that trial counsel was ineffective for erroneously (1) objecting to the state's comments that John had the burden of production and proof on the issues of self-defense and the "sudden passion or fit of rage" component of voluntary manslaughter, and (2) telling the jury that John did not have to prove anything. John also complains that counsel was ineffective for failing to object when the trial court erroneously instructed the jury that he had a duty to retreat when there was no such duty under the facts of this case.
XII. Misunderstanding of Burden of Proof
{¶ 68} In response to the state's closing argument that John had to prove self-defense and voluntary manslaughter, John's counsel said, "And I do not have to prove self-defense, and I do not have to prove involuntary manslaughter, and I make no apology for it. I will tell you the bottom line: If he wants a conviction for aggravated murder, he has to prove that my client had a prior calculation and design, that he had a scheme. He has to have a plan. He has to have proof for it, instead of speculation, instead of wild insinuation." The assistant prosecutor subsequently argued that John's counsel was wrong when he said that he did not have to prove voluntary manslaughter and self-defense. At that point, John's counsel interrupted and asked for a sidebar conference. He objected to the prosecution's statement that he had an obligation to prove anything on behalf of John. He said that he had no burden to go forward with anything. The trial court overruled the objection, stating that John did have the burden to prove self-defense.
{¶ 69} But for the sidebar conference, we would have concluded that what defense counsel was arguing, albeit inartfully, was that the state had the burden to prove that John had a plan and that John did not have the burden to negate any of the elements of the charged offenses. But the sidebar conference made it clear that counsel really believed that he had no burden to prove self-defense or voluntary manslaughter. This was incorrect. John had the burden of persuading the jury, by a preponderance of the evidence, that he had acted under the influence of sudden passion or in a sudden fit of rage that was brought on by serious provocation from Shannon that was reasonably sufficient to incite him into using deadly force.[30] Furthermore, John had the burden to prove each element of self-defense by a preponderance of the evidence.[31] Thus, for counsel to have stated that he had no burden to prove voluntary manslaughter or self-defense constituted deficient performance.
{¶ 70} We must next determine whether there is a reasonable probability that, but for counsel's incorrect understanding of the law, the result of John's trial would have been different. As to the effect on the jury, the trial court correctly charged the jury that John had the burden of proving that he had knowingly acted under the influence of sudden passion or a sudden fit of rage and that he had acted in self-defense. It also instructed the jury that closing arguments were not evidence. Further, we have not been directed to anything to suggest that the jury did not follow the trial court's instructions. Because the jury is presumed to have followed the instructions given by the trial court,[32] John has not demonstrated prejudice as to the effect of counsel's deficient performance concerning the jury instructions.
{¶ 71} We must also determine whether his counsel's misunderstanding of the law prejudiced John in how counsel presented evidence on these issues. We first note that counsel was limited by the confession that John had given to the police. Counsel presented evidence that Shannon attacked John and that he responded by swinging a bat to stop her attacks. According to John's interpretation of the evidence, Shannon returned home, intoxicated, and became angry because he had had sexual intercourse with another woman in the house. Shannon followed him into his bedroom, after getting a kitchen knife. When she jabbed at him with the knife, he warned her to stop, jumping on the bed and switching places with Shannon. He grabbed a bat from the dresser. He pushed Shannon away twice before swinging the bat in an attempt to hit Shannon's shoulder. Instead, he hit her head. His theory was that this was a domestic dispute that got out of control.
{¶ 72} The trial court concluded that the evidence was sufficient to warrant instructions on voluntary manslaughter and self-defense. The jury was provided with the opportunity to consider these issues. We conclude that, in spite of counsel's mistaken view of the law, John was not prejudiced.
XIII. Erroneous Self-Defense Instruction
{¶ 73} John next argues that trial counsel was ineffective because counsel failed to object to that part of the self-defense charge that John had a duty to retreat from his home before using lethal force. The trial court instructed, in part, "The defendant had a duty to retreat if the defendant was at fault in creating the situation, or the defendant did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from that danger was by the use of deadly force." The instruction was erroneous. There is no duty to retreat from one's home.
{¶ 74} In Ohio, to justify killing in self-defense, a defendant must prove that he (1) was not at fault in creating the violent situation, (2) had a bona fide belief that he was in danger of death or great bodily harm and the only way to escape was by using force, and (3) did not violate any duty to retreat or avoid the danger.[33] Further, "there is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home."[34] The trial court simply misunderstood the law of self-defense. We have seen this error before.[35]
{¶ 75} We next must ask whether, but for the instruction to the jury that John had a duty to retreat, the trial's outcome have been different. The compelling evidence of John's guilt eliminates the possibility of prejudice. The jury would have rejected his theory of self-defense even had it been instructed that John had no duty to retreat.[36] While one blow to Shannon's head may have constituted self-defense, the next several blows John rendered to Shannon's head while she was attempting to rise from the bed removed John's action from being defensive. We overrule John's sixth assignment.
XIV. Sentencing
{¶ 76} In his last assignment, John maintains that the trial court erroneously imposed the maximum sentence for tampering with evidence. He also challenges the imposition of consecutive sentences.
A. Maximum Term for Tampering with Evidence
{¶ 77} John was sentenced to five years' imprisonment for tampering with evidence, a third-degree felony, as a result of his concealment of Shannon's body. Five years was the maximum prison term allowed. R.C. 2929.14(C) provides the findings that the sentencing court must make before imposing the maximum term. After making its findings, the sentencing court must give reasons supporting them.[37]
{¶ 78} The only R.C. 2929.14(C) finding made by the trial court was that John had committed one of the worst forms of the offense. It indicated this finding on the felony-sentencing worksheet. It provided no reason for the finding on the worksheet or in the transcript of the sentencing hearing. Thus, we conclude that the trial court's imposition of the maximum term was improper.
B. Multiple Prison Terms Imposed for Multiple Offenses When AggravatedMurder Is One of the Offenses
{¶ 79} John also challenges the imposition of consecutive sentences for both the aggravated murders and for the evidence tampering. We must first determine whether we can review the imposition of consecutive sentences when one or more of the sentences was imposed for aggravated murder.
{¶ 80} R.C. 2953.08(D) states, "A sentence imposed for aggravated murder * * * pursuant to sections R.C. 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." It is interesting how various appellate courts, depending on the circumstances under consideration, have interpreted this statute. Our court, while not considering consecutive sentences for multiple aggravated murders, has determined that R.C. 2953.08(D) precludes appellate review of the prison term imposed for aggravated murder because the penalties are mandatory.[38]
{¶ 81} The Twelfth Appellate District has agreed that it has no jurisdiction under R.C. 2953.08(D) to review a sentence for aggravated murder. But it has concluded that it can review the procedure used to reach that sentence.[39] In State v. Hancock, the state appealed the trial court's imposition of a life sentence without parole for an aggravated murder. The trial court had declared a mistrial during the penalty phase due to the admission of presumptively prejudicial evidence. It imposed the sentence without first weighing the aggravating circumstances and the mitigating factors.
{¶ 82} The appellant argued that R.C. 2953.08(D) precluded appellate review. The reviewing court determined that it did not have jurisdiction to review the sentence. But it concluded that it was not being asked to review the sentence, but to review the procedure the trial court used in determining the sentence. It held that it had "jurisdiction to hear the case as to procedural matters and the trial court's evidentiary rulings."[40]
{¶ 83} The appellate court determined that the trial court had erred by not weighing the aggravating circumstances and mitigating factors, reversed the judgment, and remanded the case. It noted, "Further, this is not an impermissible resentencing pursuant to R.C.2953.08(D), but instead an implementation of the proper procedure that R.C. 2929.03 requires for a trial court to utilize when imposing a sentence for a defendant found guilty of aggravated murder. It is axiomatic that a sentence cannot be correct where the trial court does not follow the statutorily required procedure."[41]
{¶ 84} For consecutive sentences, there have been no challenges to appellate jurisdiction under R.C. 2953.08(D) when only one of the sentences has been imposed for aggravated murder. This makes sense because the aggravated-murder sentence is mandatory.[42] It has to be imposed. Further, it is the most severe penalty compared to the penalties available under the more general sentencing statutes. Thus, it is the sentences for the more general felonies that will be made consecutive to the aggravated-murder sentence. And nothing in R.C. 2953.08(D) precludes review of an order that sentences imposed to punish general felonies be made consecutive to an aggravated-murder sentence.
{¶ 85} The problem arises when the sentences ordered to be served consecutively are both for aggravated murder. Then the language of R.C.2953.08(D) arguably becomes an issue.
{¶ 86} Two appellate courts have considered the issue of whether R.C. 2953.08(D) precludes review of an order that the sentences imposed for multiple murders or aggravated murders be consecutively served.
{¶ 87} One appellate court has interpreted the language in R.C.2953.08(D) that a sentence imposed under R.C. 2929.02 to 2929.06 "is not subject to review under this section" to preclude review of the imposition of consecutive sentences for multiple aggravated murders.[43]
The court provided no other analysis.
{¶ 88} But in State v. Steele,[44] a case involving the imposition of consecutive sentences for two murder offenses, another appellate court determined that R.C. 2953.08(D) did not preclude review of the imposition of consecutive sentences. It concluded that R.C. 2953.08
was not an exclusive basis for appealing a sentence, because R.C.2953.08(A) states that its provisions are in addition to any other right to appeal. Thus, "an appeal of a murder sentence may still be based on traditional grounds for appeal independent of those set forth in R.C.2953.08."[45] It recognized a contention that a sentence was contrary to law or an abuse of discretion as one of the "traditional grounds" that would permit an appeal. In the case of the imposition of consecutive sentences, it held that R.C. 2953.08(D) did not prohibit review of a claim that the sentence was contrary to law, i.e., contrary to R.C.2929.14(E)(4).
{¶ 89} We conclude that R.C. 2953.08(D) does not preclude us from reviewing the imposition of consecutive sentences for multiple aggravated murders, but for different reasons.
{¶ 90} Sentencing for murder and aggravated murder falls under a special, comprehensive statutory scheme different from that applied to other felonies.[46] The prison sentences are mandatory. "Sentencing for aggravated murder and murder are set forth in the statutes defining the substantive offense and are governed by R.C. 2929.02(A) and (B) respectively. The Senate Bill 2 general felony sentencing statutes apply to lesser offenses classified as first through fifth degree felonies. See R.C. 2929.14(A)."[47] The general felony sentencing statutes exclude aggravated murder under R.C. 2929.12(A), 2929.13(F), and 2929.14(A) as to the term of imprisonment to be imposed. Courts have determined that, even before Senate Bill 2, "the general felony sentencing requirements did not apply in aggravated murder cases."[48]
{¶ 91} R.C. 2929.03 provides the procedure for imposing a sentence for aggravated murder. R.C. 2929.03(A)(1), the statute applicable to John's offense, states that if the indictment does not contain a death-penalty specification and the defendant is found guilty of aggravated murder, the court must impose a life sentence with parole eligibility after 20 years. Nothing in the statute, however, discusses the imposition of consecutive sentences.
{¶ 92} Both before Senate Bill 2 and afterwards, the applicable penalties for aggravated murder and the procedure for determining what sentence to impose have been contained in statutes separate from the general felony sentencing statutes. But before Senate Bill 2, R.C. 2929.41
discussed the imposition of consecutive sentences and was applied to either aggravated murder, murder, or other felonies. It left the decision to the trial court's discretion.[49] R.C. 2929.41(E) limited that discretion by providing an aggregate minimum term of incarceration for multiple sentences imposed consecutively.[50] But the Ohio Supreme Court in State v. Elam determined, "The fifteen-year limit on an aggregate minimum term of incarceration set by R.C. 2929.41(E)(2) does not apply to multiple terms imposed consecutively to a sentence for aggravated murder."[51]
{¶ 93} After the enactment of Senate Bill 2, R.C. 2929.41 read, in part, that concurrent sentences were to be imposed for multiple offenses, except as provided in R.C. 2929.14(E). R.C. 2929.41(E) provides the procedure for determining whether consecutive sentences may be imposed for "multiple prison terms" resulting from "convictions of multiple offenses." Aggravated murder is not excluded in that provision in the way it is in R.C. 2929.12(A), 2929.13(F), 2929.14(D)(3)(a), and 2929.14(A). Thus, just as before the enactment of Senate Bill 2, under the current sentencing statutes the actual sentence for aggravated murder is governed by a statutory procedure different from that applied to general felonies, but the determination of whether to order consecutive sentences is governed by the same statute both for general felonies and for aggravated murder — currently R.C. 2929.14(E).
{¶ 94} Having determined that the procedure with which a trial court must comply to impose consecutive sentences for multiple aggravated murders is found in R.C. 2929.14(E), we examine R.C. 2953.08(D) to determine if its language precludes our review of the trial court's compliance with R.C. 2929.14(E).
{¶ 95} R.C. 2953.08(D) states, "A sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the RevisedCode is not subject to review under this section." (Emphasis added.) The imposition of consecutive sentences for multiple aggravated murders is not imposed pursuant to R.C. 2929.02 through 2929.06. It is imposed pursuant to R.C. 2929.14(E). Thus, we hold that R.C. 2953.08(D) does not preclude our review of the imposition of consecutive sentences when one or more of the offenses is aggravated murder. (The same analysis would apply to one or more murder sentences made consecutive either to another murder sentence or to a sentence for another type of offense.)
{¶ 96} We now review John's assertion that the trial court erred by ordering his sentences to be served consecutively pursuant to R.C.2929.14(E)(4). R.C. 2929.14(E)(4) requires that before imposing consecutive sentences the trial court must make the findings that consecutive sentences are (1) necessary to protect the public from future harm or to punish the offender and (2) not disproportionate to the seriousness of the offender's conduct and the danger he poses to the public. It must also find one of the following: (1) the offender was awaiting trial, under certain statutory sanctions, or under post-release control when he committed the multiple offenses; (2) the harm caused was so great or unusual that a single prison term for any of the offenses committed as part of a single course of conduct would not adequately reflect the seriousness of the offender's conduct; or (3) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future harm by the offender.[52] The trial court must also provide its reasons for each finding.[53]
 1. Tampering with Evidence
{¶ 97} The trial court found that consecutive sentences were necessary to protect the public and were not disproportionate to the seriousness of John's crimes. It also found that the physical harm was so great or unusual that a single prison term was inadequate to reflect the seriousness of John's conduct. It stated as its reason for these findings that a concurrent sentence would allow one life to go unaccounted for even though John's actions took two lives. While this reasoning may pertain to consecutive sentences for the aggravated murders, we do not understand how it pertains to the charge of evidence tampering. Thus, we conclude that the record fails to support the trial court's decision to make the sentence for tampering with evidence consecutive to the sentences for aggravated murder.
2. Aggravated Murders
{¶ 98} We now determine whether the trial court erred by imposing consecutive sentences for the aggravated murders. The trial court made all the necessary findings under R.C. 2929.14(E), including a finding that the physical harm John caused was so great or unusual that a single prison term would be inadequate. The reason it gave for all these findings was that John had taken two lives and that a concurrent sentence would leave one of those lives unaccounted for. We believe that this reason was sufficient.[54]
{¶ 99} Thus, we conclude that the trial court erroneously sentenced John for tampering with evidence. We find no error in its imposition of consecutive sentences for the two aggravated murders.
X. Conclusion
{¶ 100} We affirm the judgment of the trial court with respect to its findings of guilt. We modify that part of John's sentence imposing a consecutive, maximum term for tampering with evidence to reflect that John is to serve a four-year sentence for that offense, and we order that sentence to be served concurrently with the consecutive sentences imposed for the aggravated murders. Thus the sentence is reduced from two consecutive life sentences plus five years to two consecutive life sentences. We remand the case to the trial court to correct its record accordingly.
Judgment affirmed with sentence modified.
Sundermann, P.J., and Hildebrandt, j., concur.
[1] See State v. Spaulding, 1st Dist. No. C-020036, 2002-Ohio-4935, ¶ 6, citing State v. Mills (1992), 62 Ohio St.3d 357, 366,582 N.E.2d 972.
[2] Id., citing Ornelas v. United States (1996), 517 U.S. 690,696-699, 116 S.Ct. 1657.
[3] Miranda v. Arizona (1996), 384 U.S. 436, 86 S.Ct. 1602.
[4] State v. Evans (2001), 144 Ohio App.3d 539, 551, 760 N.E.2d 909.
[5] See State v. Revel, 12th Dist. Nos. CA2001-09-223 and CA2001-09-230, 2002-Ohio-4231, ¶ 15, and cases cited. See, also,United States v. Davis (1994), 512 U.S. 452, 114 S.Ct. 2350.
[6] See State v. McNeel (May 22, 1998), 1st Dist. No. C-960980.
[7] Id., quoting State v. Franklin (1991), 62 Ohio St.3d 118,580 N.E.2d 1, paragraph two of the syllabus.
[8] See Curl v. Lane (Dec. 5, 1988), 12th Dist. No. 88-03-006.
[9] State v. Davenport (July 30, 1999), 1st Dist. No. C-980516, citingState v. Sorrels (1991), 71 Ohio App.3d 162, 593 N.E.2d 313; State v.Williams (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323, paragraph three of the syllabus.
[10] Evid.R. 801(C).
[11] See State v. Sutorius (1997), 122 Ohio App.3d 1, 8, 701 N.E.2d 1, citing Weissenberger, Ohio Evidence (1996) 365, Section 803.30.
[12] Id.
[13] Evid.R. 801(D)(2).
[14] State v. Harrison (May 12, 1993), 1st Dist. No. C-920422, citing Evid.R. 703 and 705.
[15] Id.
[16] State v. Stewart, 11th Dist. No. 2001-A-0011, 2002-Ohio-3842, ¶ 42, quoting Vargo Travelers Ins. Co. (1987), 34 Ohio St.3d 27,516 N.E.2d 226, paragraph one of the syllabus; State v. Simpson (Sept. 30, 1994), 11th Dist. No. 93-L-014; State v. Goshay (Nov. 18, 1993), 8th Dist. No. 63902.
[17] Accord State v. Austin (1976), 52 Ohio App.2d 59, 63-64,368 N.E.2d 59.
[18] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[19] Accord State v. Beaver (1997), 119 Ohio App.3d 385, 392,695 N.E.2d 332; State v. Avery (June 8, 1999), 7th Dist. No. 96 CA 33.
[20] State v. Jenks, 61 Ohio St.3d at 272.
[21] State v. Franklin (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1.
[22] See State v. Smith, 87 Ohio St.3d 424, 442, 2000-Ohio-450,721 N.E.2d 93.
[23] See State v. Smith (1984), 14 Ohio St.3d 13, 15,470 N.E.2d 883.
[24] See State v. Ritchie (July 25, 1997), 2nd Dist. No. 15792;State v. Chinn (Dec. 27, 1991), 2nd Dist. No. 11835; Columbus v.Bee (1979), 67 Ohio App.2d 65, 425 N.E.2d 409.
[25] Columbus v. Bee, 67 Ohio App.3d at 80, quoting State v. Stanton
(1968), 15 Ohio St.2d 215, 216, 239 N.E.2d 92.
[26] See Strickland v. Washington (1984), 466 U.S. 668, 688,104 S.Ct. 2052.
[27] See id. at 687.
[28] Id. at 694.
[29] See id. at 697.
[30] See State v. Rhodes (1992), 63 Ohio St.3d 613, 590 N.E.2d 261, syllabus.
[31] See State v. Martin (1986), 21 Ohio St.3d 91, 488 N.E.2d 166, syllabus.
[32] See State v. Stallings, 89 Ohio St.3d 280, 286, 2000-Ohio-164,731 N.E.2d 159.
[33] See State v. Thomas, 77 Ohio St.3d 323, 326, 1997-Ohio-269,673 N.E.2d 1339.
[34] Id. at 328. See, also, State v. Cassano, 96 Ohio St.3d 94,2002-Ohio-3751, 772 N.E.2d 81.
[35] See, e.g., State v. Miller, 149 Ohio App.3d 782, 2002-Ohio-5812,778 N.E.2d 1103; In re Maupin (Dec. 11, 1998), 1st Dist. No. C-980094.
[36] Accord State v. Roberts (2000), 139 Ohio App.3d 757, 764,745 N.E.2d 1057.
[37] See State v. Edmonson, 86 Ohio St.3d 324, 328-329, 1999-Ohio-110,715 N.E.2d 131.
[38] See State v. Terrell (June 13, 2003), 1st Dist. No. C-020194.
[39] State v. Hancock, 12th Dist. Nos. CA2001-12-115, CA20001-12-116, and CA2002-01-004, 2003-Ohio-1616.
[40] Id. at ¶ 12.
[41] Id. at ¶ 46.
[42] R.C. 2929.03.
[43] State v. Brown (Feb. 9, 2001), 6th Dist. No. WD-00-033.
[44] State v. Steele (June 28, 2001), 10th Dist. No. 00AP-499.
[45] Id., citing Griffin Katz, Ohio Felony Sentencing Law (2000) at 651-652.
[46] See State v. Hollingsworth (2001), 143 Ohio App.3d 562, 566,758 N.E.2d 713; State v. Robinson, 6th Dist. Nos. L-00-1272, L-00-1384, and L-001392, 2001-Ohio-3087; State v. Terrell, supra; State v. Johnson,
7th Dist. No. 99 C.A. 49, 2001-Ohio-3441.
[47] State v. Hollingsworth, 143 Ohio App.3d at 566, fn. 1.
[48] Id. 569.
[49] See State v. Lundgren (Dec. 30, 1993), 11th Dist. No. 90-L-150;State v. Doyle (Sept. 16, 1991), 3rd Dist. Nos. 5-90-52 and 5-90-53;State v. Snyder (Feb. 2, 1990), 6th Dist. No. L-88-172.
[50] State v. Elam, 68 Ohio St.3d 585, 586, 1994-Ohio-317,629 N.E.2d 442, syllabus.
[51] State v. Elam, 68 Ohio St.3d 585, syllabus.
[52] R.C. 2929.14(E)(4).
[53] See R.C. 2929.19(B)(2)(c); State v. Edmonson, supra.
[54] See State v. Tatum (Mar. 6, 2001), 10th Dist. No. 99AP-1141.